**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**KIMBERLY S. BENDER,**

      **Plaintiff,**

  v.                              **Civil Action 2:20-cv-3321
Judge James L. Graham
Magistrate Judge Kimberly A. Jolson**

**COMMISSIONER OF
SOCIAL SECURITY,**

      **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, Kimberly S. Bender, brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income ("SSI"). For the reasons set forth below, it is **RECOMMENDED** that Plaintiff's Statement of Errors (Doc. 10) be **OVERRULED** and that judgment be entered in favor of Defendant.

**I.    BACKGROUND**

Plaintiff filed her application for SSI on April 7, 2014, alleging that she was disabled beginning January 24, 2014, due to a head trauma, cluster headaches, memory loss, vision problems, and bi-polar disorder. (Tr. 161–66, 180). After her application was denied initially and on reconsideration, the Administrative Law Judge ("ALJ") held a hearing on June 23, 2016. (Tr. 38–66). The ALJ denied benefits in a written decision on August 16, 2016. (Tr. 18–36). That became the final decision of the Commissioner when the Appeals Council denied review. (Tr. 1–6).

On September 6, 2017, Plaintiff filed a case in this Court seeking a review of the final decision of the Commissioner. (Tr. 889–91). Upon a joint stipulation of the parties, the District

Court remanded the case to the Commissioner. (Tr. 892–98). The Appeals Council issued a Remand Order on July 13, 2018 (Tr. 899–904), and a hearing was held on February 28, 2019 (Tr. 843–63). On April 8, 2019, the ALJ issued a decision again denying Plaintiff's application for benefits. (Tr. 816–42). Plaintiff did not request review by the Appeals Council opting to directly file suit with this Court, on June 30, 2020 (Doc. 1). The Commissioner filed the administrative record on August 18, 2020 (Doc. 7). This matter is now ripe for consideration. (*See* Docs. 10, 11).

### A. Relevant Hearing Testimony

The ALJ summarized the testimony from Plaintiff's supplemental hearing:

> At the supplemental hearing the [Plaintiff] testified that she is unable to read or understand a newspaper. She is also unable to make change. Her neck is stiff and cannot move it one way. She has pain down to her low back, and it is constant pain. She only got one week of relief from the spinal injections. Her vision at the hearing was so blurry that she was seeing two of me. It throws her off balance. She also has double vision. She has a headache every day. The headache throbs and hurts. It can last up to a week at a time, and she has had six days this month without a headache. When she has one[,] she stays home in a dark room and tries not to focus on anything. Sound makes it hurt. If in the living room she has to turn down the television. The [Plaintiff] stated she gets irritable. If she goes to the store she cannot stand to be near a group of people. She has memory problems. If reading a paper and someone asks her a question[,] she will not remember what she read. She also has anxiety attacks more than one time per month. Fifteen days out of the month she is irritable. She cannot sleep a full night, five hours if that. Her energy during the day is low, and she takes a two[-] hour nap during the day. Most of the day she sits in a recliner or lies down. If she sits in a chair her back and hip will hurt. She has to change position, and after three hours she has to get up. On a normal day she can stand for two hours and then sit five hours.

(Tr. 831).

### B. Relevant Medical Evidence

Because Plaintiff's Statement of Errors pertains to only her cerebral trauma and headaches, the Undersigned limits her review of the relevant medical evidence to the same. The ALJ usefully summarized Plaintiff's medical records concerning her head trauma and headaches:

2

1. *2015 Medical Records*

   The ALJ began by discussing Plaintiff's treatment history and medical records from 2015:

   . . . Additional evidence reveals that on January 14, 2015, the [Plaintiff] was seen by Bryan Bjormstad, M.D., for follow-up of her post-traumatic Bell's palsy and motor vehicle collision. The [Plaintiff] reported that her neck pain, facial weakness, and headaches had improved, and there were no new symptoms. On physical examination the [Plaintiff] was in no acute distress. Heart was regular rhythm, and pulmonary was non-labored with no wheezes. Neck was supple. There was no cognitive impairment and no involuntary movements. Coordination was intact. Gait was also intact with no ataxia. Language was normal (Exhibit B-22F).

   On July 16, 2015, the [Plaintiff] was seen by Charles Sales, M.D., a neurologist, for syncope and collapse and intractable chronic cluster headaches. She reported having a headache for the past four days. Her last spell of light headedness and syncope was in March 2015 at which time she went to the emergency room. Review of systems was otherwise negative except for depression and anxiety. Blood pressure was 118/77, and Body Mass Index (BMI) was 47.9. Cardiovascular and pulmonary were normal, and there was no lower extremity edema. There was an abnormality of the left pupil. Motor strength was 5/5 throughout, and reflexes were present and equal. Sensation was intact, and gait was normal with the ability to heel/toe walk and tandem walk. The [Plaintiff] was alert and oriented. Comprehension and fluency were intact as was naming and repetition. The [Plaintiff] was able to recall 3/3 words after five minutes and spell "world" forwards and backwards. An MRI from January 20, 2015, showed findings possibly secondary to an acute infarct versus subarachnoid blood. Diagnoses were cluster headaches, pupillary abnormality of the left eye, and subarachnoid hemorrhage. Recommendations included oxygen inhalation therapy at the onset of the headache (Exhibit B-21F, pp. 1–6).

   The [Plaintiff] followed-up with Dr. Sales on November 12, 2015. She stated that the oxygen helped reduce the duration of her headaches from 15 to five minutes, and reduced the occurrence from every three to four days to as much as two weeks at a time. However, for the past two weeks she was getting them every other day. She also reported being hospitalized in August having passed out and having no memory of the event. Review of systems was further positive for blurry vision, lightheadedness, depression, and anxiety. Blood pressure was 125/80, and BMI was 45.9. Physical examination was positive for a flat affect. Comprehension, naming, repetition, and fluency were intact as was recall. Neurological testing was unchanged (Exhibit B-21F, pp. 6–12).

(Tr. 822–23).

2. *2016 Medical Records*

The ALJ then summarized Plaintiff's treatment history and medical records from 2016:

The [Plaintiff] then saw Dr. Sales on March 3, 2016. This time diagnoses were tension/cluster headache, medication overuse headache, subarachnoid hemorrhage, and spells. The [Plaintiff] reported that she was getting headaches three to four times per day as of a couple of weeks prior. She was taking Excedrin Migraine pills six per day. There was no change in her review of systems. Blood pressure was 131/90. There was limitation of motion in neck flexion/extension and a right to left head tilt. Mental status was unchanged. Neurological testing was also unchanged. It was noted that an EEG in December 2015 was normal. Her medications were then adjusted (Exhibit B-21F, pp. 12–17).

On September 1, 2016, the [Plaintiff] presented to the emergency room with a headache. The [Plaintiff] had run out of her Imitrex. Review of systems was otherwise negative. Blood pressure was 136/69, and BMI was 44.3. On physical examination the [Plaintiff] was in no distress. There were no physical abnormalities, and mood, affect, behavior, and thought content were normal. She was treated with IV fluid and medications with complete resolution of her headache. Diagnosis was non-intractable headache, unspecified chronicity pattern, unspecified headache type (Exhibit B-26F, pp. 148–55).

On November 7, 2016, the [Plaintiff] saw Kiran Rajneesh, M.D., a neurologist, for her headaches. The [Plaintiff] reported two types of headaches. One was occurring multiple times per day, every day of the week for which she used oxygen. The second type was present 30 days of the month, was constant and aggravated by touching and relieved by nothing. Her pain level on the best day was "6" and on the worst day "10." It was noted that a CT angiogram of the brain from December 2015 was normal. Blood pressure was 125/83, and BMI was 45.1. On physical examination the [Plaintiff] was in no acute distress and was alert. Mood and affect were appropriate. There was pain by palpation of bilateral occipital nerves. There was no pain to palpation with neck range of motion. Straight leg raising was negative, and range of motion was normal without pain. There were no joint abnormalities or instability. There was no atrophy and no weakness of the extremities. Sensation was intact, and reflexes were present and equal. Gait was also normal as was language and speech. Assessment was headaches consistent with occipital neuralgia as well as cluster headaches. Then on November 30, 2016, the [Plaintiff] underwent a greater occipital nerve block. Physical examination was unchanged (Exhibit B-23F, pp. 1–8).

The [Plaintiff] was again at the emergency room on December 17, 2016, with a headache. She denied syncope, numbness, weakness, paresthesia, nausea, vomiting, neck pain, and confusion. Review of systems was otherwise negative, including for agitation, confusion, decreased concentration, hallucinations, sleep disturbance, and suicidal ideas. Blood pressure was 159/72. The [Plaintiff] was in

4

>no distress, and mood and affect were normal. The only abnormality on physical examination was tenderness on palpation of the right temporalis muscle. Diagnosis was migraine without aura and without status migrainous, not intractable. The [Plaintiff] had a CT scan of the head that did not show any acute changes. There was mild parenchymal volume loss advanced for stated age (Exhibit B-26F, pp. 156–63).

(Tr. 823–24).

   3. *2017 Medical Records*

   Next, the ALJ discussed Plaintiff's medical records and treatment history from 2017:

   >When seen on February 8, 2017, with Dr. Rajneesh, she reported 80 percent improvement since the nerve block for one to two blocks. Current pain was 9/10. Physical examination was unchanged, and the [Plaintiff] was in no acute distress. She was then given a greater occipital nerve steroid injection. The [Plaintiff] was next seen by Dr. Rajneesh on May 10, 2017, for consideration of botox injections. The headaches were still occurring 30 per month and lasting 6–24 hours. The headaches were mitigated by nothing. Physical examination was again unchanged with mood and affect congruent. The [Plaintiff] was also noted to be in no acute distress. Dr. Rajneesh assessed the headaches as migraines and arranged for botox therapy. Botox therapy was administered on June 28, 2017 (Exhibit B-23F, pp. 8–17).

   >The [Plaintiff] returned to the emergency room on July 3, 2017, due to weakness, fatigue, and blurred vision. Physical examination was normal with normal muscle tone, coordination, gait, and neurological findings. Mood, affect, and behavior were also normal. EKG showed sinus rhythm and voltage criteria for left ventricular hypertrophy. No diagnosis was offered (Exhibit B-26F, pp. 164–83).

   >On September 27, 2017, and January 10, 2018, the [Plaintiff] saw Dr. Rajneesh for additional botox injections. At the first visit she reported that after the last botox injections her headaches went from 28 days to 14 days per month. At the second visit she reported no improvement in the frequency of her headaches, and she preferred stopping the Botox therapy. Dr. Rajneesh recommended medication and a headache rehabilitation program, but the [Plaintiff] deferred both (Exhibit B23F, pp. 18–22).

   >On November 16, 2017, the [Plaintiff] was seen by Ashleigh Hoover, CNP, for facial swelling. She denied vision, dental, and ear problems and stated that she had been to the eye doctor three weeks previously, and "he said everything was normal." On the Patient Health Questionnaire (PHQ), the [Plaintiff] achieved a "0" depression score. On physical examination there was slight swelling to the right maxillary area. Mood, affect, thought content, and behavior were normal. There were no other abnormalities (Exhibit B-24F, pp. 42–44).

5

(Tr. 824).

    4.  *2018 Medical Records*

Finally, the ALJ summarized Plaintiff's 2018 medical records and treatment history:

> . . . On July 20, 2018, the [Plaintiff] went to the emergency room due to a headache. She rated her pain as 10/10 but was noted to be in no distress. There was tenderness along the frontal sinus area but no neurological deficits, unequal pupils, or nuchal rigidity. CT scan of the head was negative for any acute findings. Ultrasound of the abdomen was likewise negative. Diagnosis was atypical migraine. The [Plaintiff] was given IV hydration and medications that relieved the migraine (Exhibit B-28F, pp. 13–29). . . .

(Tr. 825).

### C. The ALJ's Decision

The ALJ found that Plaintiff has not engaged in substantial gainful activity since February 24, 2014, the application date. (Tr. 821). He then determined that Plaintiff suffered from the following severe impairments: degenerative disc disease of the lumbar spine, obesity, bipolar disorder, anxiety disorder, and borderline intellectual functioning. (Tr. 822). The ALJ found that Plaintiff "has recovered well from her accident and cerebral trauma" and that "[h]er headaches [were] [] well controlled with medications and oxygen therapy." (Tr. 827). Accordingly, he concluded that these impairments were "not severe" as they did "not significantly interfere with [Plaintiff]'s ability to perform work-related activities." (*Id.*). The ALJ also found that none of Plaintiff's impairments, either singly or in combination, met or medically equaled a listed impairment. (*Id.*).

As to Plaintiff's residual functional capacity ("RFC"), the ALJ opined:

[T]he [Plaintiff] has the residual functional capacity to perform medium work as defined in 20 CFR 416.967(c) except: occasionally climbing ramps/stairs; never climbing ramps/ladders/scaffolds; frequently balancing; no work around moving machinery or unprotected heights; and no commercial driving. Additionally, the [Plaintiff] is limited to: understanding, remembering, and carrying out simple tasks

6

    and instructions; maintaining attention and concentration for two[-] hour segments over an eight[-] hour workday; responding appropriately to supervisors and coworkers; and adapting to simple changes and avoiding hazards in a setting without strict production standards.

(Tr. 828).

  Additionally, based upon his review of the record, the ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record." (Tr. 831).

  The ALJ then turned to the relevant opinion evidence. He afforded partial weight to the opinions of the state agency physicians, based on additional evidence that showed moderate stenosis of the lumbar spine with mild to moderate disc disease. (Tr. 829). He thus found Plaintiff could climb ramps or stairs only occasionally. (*Id.*). Moreover, the ALJ questioned the state agency physicians' limitations on Plaintiff's depth perception, noting that they did not specify how such limitations would impact her ability to work and that the evidence following remand did not demonstrate any visual impairment. (*Id.*). Next, the ALJ assigned great weight to the January 27, 2014, opinion of Plaintiff's treating physician, Dr. Bryan Bjornstad, who opined that Plaintiff should refrain from all driving. (Tr. 830).

  Relying on the VE's testimony, the ALJ concluded that Plaintiff was unable to perform her past relevant work as a weaver, quality control worker, cashier, stocker, or secretary, but could perform jobs that exist in significant numbers in the national economy, such as a cheese maker, drip box tender, and laundry dry clean worker. (Tr. 833–34). The ALJ thus concluded that Plaintiff "has not been under a disability, as defined in the Social Security Act, since February 24, 2014, the date the application was filed." (Tr. 835).

7

## II. STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

## III. DISCUSSION

While Plaintiff raises one assignment of error, her argument is actually twofold. She asserts that the ALJ failed to properly characterize her headaches and cerebral trauma as severe. (Doc. 10 at 7–11). Consequently, she says, the ALJ failed to properly accommodate these limitations in the RFC. (*See id.*). As explained below, the Undersigned disagrees.

### A. Severity

A "threshold step[] in the five-step disability analysis is determining whether a claimant has an impairment that is severe." *Katona v. Comm'r of Soc. Sec.*, No. 14-CV-10417, 2015 WL

8

871617, at *5 (E.D. Mich. Feb. 27, 2015) (citing 20 C.F.R. § 416.920(a)(4)(iii)). "It is the claimant's burden to prove the severity of her impairments[.]" *Workman v. Berryhill*, No. CV 7:16-261-DCR, 2017 WL 3880661, at *2 (E.D. Ky. Sept. 5, 2017) (citing *Herr v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999)). "'An impairment or combination of impairments is not severe if it does not significantly limit [a claimant's] physical or mental ability to do basic work activities,' which are the 'abilities and aptitudes necessary to do most jobs.'" *Workman*, 2017 WL 3880661, at *2 (quoting 20 C.F.R. § 404.1521(a), (b)). "'[T]he severity determination is a *de minimis* hurdle in the disability determination process.'" *Workman*, 2017 WL 3880661, at *2 (internal quotation marks omitted) (quoting *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008)). Importantly, however, "[t]he mere diagnosis of a condition does not thereby establish its severity." *Workman*, 2017 WL 3880661, at *2 (citing *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988)).

In assessing the severity of Plaintiff's headaches and cerebral trauma, the ALJ concluded that "[h]er headaches are now well controlled with medications and oxygen therapy." (Tr. 827). Plaintiff asserts that "[t]he ALJ's entire reasoning for" classifying these impairments as non-severe "was that [her] oxygen treatment with Dr. Sales resulted in [her] headaches being 'controlled[.]'" (Doc. 10 at 9–10).

Not so. In concluding that her headaches were non-severe, the ALJ noted:

- In July 2015, Plaintiff reported that Excedrin "usually will help" and that she "does not need additional medication."
- In November 2015, Plaintiff reported that "oxygen helps reduce [headache] duration from 15 minutes to 5 minutes, also reduces frequency from occurring every 3–4 days to as much as 2 weeks at a time."
- Also, in November 2015, Dr. Sales reported that she experienced "some benefit from her oxygen inhalation therapy as an outpatient in terms of reducing severity, frequency and duration of attacks."
- December 2015 diagnostic testing was normal, including Plaintiff's CT angiogram of the brain and EEG.

9

- On September 1, 2016, Plaintiff presented to the emergency room with a headache after running out of her headache mediation, Imitrex. On physical examination, Plaintiff was not in distress, there were no physical abnormalities, and mood, affect, behavior, and thought content were normal. She received IV fluid and medications with complete resolution of her headache.
- In December 2016, Plaintiff went to the ER for headaches but denied syncope, numbness, weakness, paresthesia, nausea, vomiting neck pain, and confusion. Review of her symptoms were otherwise negative, including for agitation, confusion, decreased concentration, hallucinations, sleep disturbance, and suicidal ideas. Moreover, Plaintiff was not in distress, her mood and affect were normal, and the only abnormality on physical examination was tenderness on palpitation of the right temporalis muscle. Plaintiff's headaches were noted to be "not intractable," and a CT scan of her head did not show any acute changes.
- In May 2017, Dr. Rajneesh arranged for Botox therapy to treat Plaintiff's headaches.
- In July 2017, when Plaintiff again went to the ER for weakness, fatigue, and blurred vision, Plaintiff's physical exam was normal with normal muscle tone, coordination, gait, and neurological findings. Her mood, affect, and behavior were also reported to be normal.
- In September 2017, Plaintiff reported that, after the last Botox injections, her headaches decreased from 28 to 14 days per month.
- In January 2018, however, she reported no improvement in the frequency of her headaches, and she asked to stop Botox therapy. Dr. Rajneesh recommended medication and a headache rehabilitation program, but Plaintiff declined both.
- On July 20, 2018, Plaintiff went to the emergency room due to a headache, and despite rating her pain as 10/10, she was not in distress. There was tenderness along the frontal sinus area but no neurological deficits, unequal pupils, or nuchal rigidity. (*Id.*). Her CT scan was negative for any acute findings, and Plaintiff received IV hydration and mediation that relieved the migraine. (*Id.*).

(Tr. 822–25).

While Plaintiff relies on different evidence to show the severity of her headaches and cerebral trauma, the ALJ reasonably concluded, based on the above evidence, that these impairments "do not significantly interfere with [her] ability to perform work-related activities." (Tr. 827). And the issue is not whether this Court would come out differently on the severity determination, but whether substantial evidence supports the ALJ's finding. *See Reed v. Colvin*, No. CIV. 13-54-GFVT, 2014 WL 318569, at *3 (E.D. Ky. Jan. 29, 2014). Because the Undersigned finds that substantial evidence supports the ALJ's non-severity finding, she does not

further scrutinize it. *See, e.g.*, *Acosta v. Comm'r of Soc. Sec.*, No. 17-12414, 2018 WL 7254256, at *8 (E.D. Mich. Sept. 6, 2018), *report and recommendation adopted*, No. 17-12414, 2019 WL 275931 (E.D. Mich. Jan. 22, 2019) ("[W]hile plaintiff cites to evidence which she believes supports a different RFC, it is not the Court's role to reweigh the evidence or to determine whether there is substantial evidence to support a different conclusion.").

### B. RFC

The more crucial question is whether the ALJ failed to consider the effects of Plaintiff's cerebral trauma and headaches after finding them to be non-severe. "The Sixth Circuit has found it 'legally irrelevant' that some of a claimant's impairments are found non-severe, when other impairments are found to be severe, because a finding of severity as to even one impairment clears the claimant of step two of the analysis and the administrative law judge should consider both the severe and non-severe impairments in the remaining steps." *Womack v. Saul*, No. 4:19-CV-00162-HBB, 2020 WL 6087950, at *4 (W.D. Ky. Oct. 15, 2020) (citing *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008)).

Accordingly, "once a severe impairment is found, the administrative law judge must consider the '*combined effect*' of all the medically determinable severe and non-severe impairments in assessing a claimant's RFC." *Womack*, 2020 WL 6087950, at *4 (emphasis in original) (quoting 20 C.F.R. §§ 404.1523(c), 404.1542(a)(2)). Importantly, an ALJ is "not necessarily obligated to include any particular (or even any) limitation in the RFC as a result of th[e] [non-severe] . . . impairment." *Friscone-Repasky v. Comm'r of Soc. Sec.*, No. 1:19 CV 2526, 2020 WL 6273933, at *7 (N.D. Ohio Oct. 26, 2020) (citation and quotation marks omitted). Rather, the ALJ must "at least make clear that [he] fairly considered the impairment in determining the RFC [he] did adopt." *Id*. (citation and quotation marks omitted).

So once the ALJ determined that Plaintiff has five severe impairments—degenerative disc disease of the lumbar spine, obesity, bipolar disorder, anxiety disorder, and borderline intellectual functioning—did he consider her headaches and cerebral trauma in the remaining steps of the disability determination? The Undersigned finds he did. Despite Plaintiff's assertion that "the ALJ failed to provide any actual consideration of her headaches in the following steps of the sequential evaluation" and thus committed reversible error (Doc. 10 at 10–11), the ALJ's decision shows otherwise.

At step four, the ALJ considered the intensity, persistence, and limiting effects of all of Plaintiff's symptoms, including her headaches and cerebral trauma, to determine the extent to which they limit her functional limitations. (Tr. 831–32). Specifically, the ALJ noted that Plaintiff testified that she has double vision and throbbing and painful headaches every day. (Tr. 831). The ALJ further noted that Plaintiff testified that sound exacerbates her headaches. (*Id.*).

But the ALJ considered this testimony in context and found numerous inconsistencies between Plaintiff's representations and the medical evidence. To start, Plaintiff "frequently reported 9/10 and 10/10 pain" but was "noted to be in no acute distress at the same time." (*Id.* (collecting records)). And "[o]ne would not expect someone to have no distress with those levels of pain." (Tr. 831). Additionally, the ALJ noted that Plaintiff "has not always followed treatment" when it came her headaches:

> [a]t one point the medical sources have told her not to take as much over the counter medications for her headaches as she was taking as they were causing rebound headaches. Yet in January 2018 she deferred medication for her headaches and also deferred a rehabilitation program (Exhibit B-23F p. 22). In September 2016 she had run out of her headache medication (Exhibit B-26F, p. 150). . . . If the claimant's symptoms were as severe as she states they are, then one would expect her to more faithfully follow treatment recommendations.

(Tr. 831–32).

Next, the ALJ noted that, while Plaintiff testified about blurry and double vision, "review of her symptoms has generally not shown any vision complaints," the "physical examinations have not reported any vision difficulties, and [she] noted that her eye doctor told her that her vision was normal." (Tr. 832).

Regarding the frequency of Plaintiff's headaches, the ALJ found those reports inconsistent, too:

> She testified that she has them approximately 24 days a month (i.e. only six days without a headache). In Exhibit B-23F, page 1, she reported having headaches every day. On page 18 of that Exhibit she reported that her headaches went from 28 days to 14 per month following Botox treatment. Yet, first she testified that she has headaches every day, but later said she has had six days of the month without headaches. However, her headaches have not interfered with her ability to perform physical examinations or even the mental status examinations.

(*Id.*).

As for her memory problems, the ALJ noted that "mental status examinations have demonstrated normal memory, and she has not had any difficulty reporting her medical history when asked." (*Id.*). The ALJ then considered Plaintiff's activities of daily living in light of her asserted symptoms:

> Despite her impairments, the claimant has been able to engage in routine, daily activities. Evidence demonstrates that she has been able to clean, shop, cook, take public transportation, pay bills, take care of personal needs, use the post office, do the dishes, walk the dogs, mow the grass in the evenings, and take care of her four children (Exhibits B-8F, B-16F, B-7F; testimony at the initial hearing). She also has a boyfriend. The amount of activities in which the claimant has been able to engage in is not indicative of someone with debilitating symptoms.

(*Id.*).

Given the above "inconsistencies within the documentary record and the claimant's testimony," the ALJ found no support for "a further reduction of the established residual functional capacity." (*Id.*). Accordingly, the ALJ did not err because, after concluding that Plaintiff's

13

headaches and cerebral trauma are non-severe impairments, he properly considered them in the remaining steps of his opinion, including when fashioning Plaintiff's RFC. *See, e.g.*, *Laux v. Berryhill*, No. 1:17CV1098, 2018 WL 3956869, at *4 (N.D. Ohio Aug. 17, 2018) (holding that the ALJ did not err in finding plaintiff's headaches to be non-severe where the ALJ "consider[ed] Plaintiff's chronic migraine headaches in determining whether Plaintiff had the RFC to perform substantial gainful activities"); *cf. Harrison v. Colvin*, No. 3:14CV00218, 2015 WL 3645838, at *7 (S.D. Ohio June 10, 2015), *report and recommendation adopted*, No. 3:14CV00218, 2015 WL 4549460 (S.D. Ohio July 27, 2015) ("The ALJ did not refer to or consider Plaintiff's fibromyalgia at step 4 and, consequently, even if fibromyalgia was correctly characterized as a non-severe impairment, it was error for the ALJ to overlook or ignore it at step 4 when assessing Plaintiff's residual functional capacity.").

Finally, it is worth noting that "Plaintiff [] does not identify any additional limitations that the ALJ should have included in the RFC to account for [her] migraines." *Carpenter v. Comm'r of Soc. Sec.*, No. 1:19-CV-282, 2020 WL 3848205, at *4 (W.D. Mich. June 18, 2020), *report and recommendation adopted*, No. 1:19-CV-282, 2020 WL 3833063 (W.D. Mich. July 8, 2020). And "the ALJ was not required to accept as true every symptom she reported and provide a corresponding limitation in the residual functional capacity assessment to account for it." *Kohler v. Colvin*, No. 3:14CV00163, 2015 WL 3743285, at *5 (S.D. Ohio June 15, 2015), *report and recommendation adopted*, No. 3:14-CV-163, 2015 WL 4214469 (S.D. Ohio July 10, 2015).

In sum, the ALJ did not commit reversible error in finding Plaintiff's headaches and cerebral trauma to be non-severe, and he properly considered the effects of these impairments in the remaining steps of his disability analysis.

## IV. CONCLUSION

Based on the foregoing, it is **RECOMMENDED** that Plaintiff's Statement of Errors (Doc. 10) be **OVERRULED** and that judgment be entered in favor of Defendant.

## V. PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed finding or recommendations to which objection is made, together with supporting authority for the objection(s). A District Judge of this Court shall make a de novo determination of those portions of the Report or specific proposed findings or recommendations to which objection is made. Upon proper objection, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

IT IS SO ORDERED.

Date: January 6, 2021  /s/ Kimberly A. Jolson
KIMBERLY A. JOLSON
UNITED STATES MAGISTRATE JUDGE